Filed 8/30/13

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| FARMERS NEW WORLD LIFE INSURANCE COMPANY,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>FRANK ALLAN REES,<br><br>    Defendant and Appellant. | B241099<br><br>(Los Angeles County<br>Super. Ct. No. BC442877) |

———

APPEAL from a judgment of the Superior Court of Los Angeles County.  Robert L. Hess, Judge.  Affirmed.

———

Blumberg Law Corporation, Ave Buchwald and John P. Blumberg for Defendant and Appellant.

Fulbright & Jaworski, Peter H. Mason and Ryan T. McCoy for Plaintiff and Respondent.

———

Wife is found dead in the street outside the home she shared with husband. Her death is investigated as a homicide. Husband, who is the sole beneficiary on wife's life insurance policy, is a suspect. Life insurance company files an interpleader action and deposits the policy benefits plus interest with the trial court. Wife's mother, who would be entitled to the policy benefits if husband were found to have feloniously and intentionally killed wife, defaults in the action. The court awards husband the interpleaded funds less attorney fees and costs requested by the life insurance company. Husband contends the attorney fees and costs award is erroneous because his right to the policy benefits never was in dispute and no potential for double liability existed, thus rendering the interpleader action unnecessary and the statutory requirements for attorney fees and costs unmet. We disagree. Under the circumstances of this case, the life insurance company was entitled to file an interpleader action, and the court did not err by exercising its discretion to award attorney fees and costs. We thus affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *Wife's Death and Husband's Claim for Benefits Under Her Life Insurance Policy*

Frank and Rosamaria Rees married in 1997.[1] In May 1998 they each obtained from Farmers New World Life Insurance Company (Farmers) a life insurance policy with benefits of $150,000. Rosamaria's policy insured her life, and Frank's policy insured his life. They named the other as the sole primary beneficiary and listed no contingent beneficiaries. According to the terms of Rosamaria's policy, if Frank predeceased Rosamaria, the benefits were to be paid to Rosamaria or to her estate.

On September 18, 2009, Rosamaria, on her way to pick up Frank from a Gamblers Anonymous meeting, was shot and killed in the street outside the home she shared with Frank. She died intestate, without a will and without having borne any children. She was predeceased by her father but survived by her mother. Farmers' insurance agent informed the company of Rosamaria's death on September 23, 2009. A claims officer contacted Frank, who indicated that the Los Angeles Police Department (LAPD) was

---

[1] Because they share the same last name, we refer to Frank and Rosamaria by their first names. We intend no disrespect.

2

investigating Rosamaria's death as a homicide. Farmers sent Frank a claim form for the policy benefits.

On October 1, 2009, a Special Investigation Unit Manager (manager) for Farmers spoke with an LAPD detective regarding Rosamaria's death. According to the manager's notes, the detective reported that "no one has been ruled out in this death. He said that [Frank] is a big gambler and has a couple million dollars in life insurance on his wife." About two weeks later, on October 14, 2009, Frank submitted a claim to Farmers for the $150,000 in life insurance benefits. Farmers responded by letter to Frank the next day, "During our claims evaluation we have contacted the [LAPD] Robbery/Homicide Division and have been informed that their investigation is ongoing and that no one has been ruled out as a suspect in the homicide of our insured [Rosamaria] at this time. Therefore, we will await the results of the police investigation before discharging our obligation in this case." About a month later, and then again the following month, Farmers sent Frank letters repeating essentially the same information. On January 12, 2010, Frank called the manager, who informed "him that the police were still conducting their investigation and no one had been ruled out as a suspect. [The manager] said that [he] would call the detective and contact [Frank] if there were any changes in [Farmers'] handling."

The manager spoke with another LAPD detective on January 18, 2010. The manager's notes stated that the police had "not completed their investigation and [said] do not pay the claim." On January 19, 2010, the manager spoke with the initial detective and noted that the police had "not ruled out Frank . . . as a suspect and the investigation is ongoing." Farmers again sent a letter to Frank informing him that the investigation was ongoing and it would await the results before discharging its obligation. On January 22, 2010, the manager left a message for Frank, in response to a call from him, indicating that Farmers is "awaiting the police investigation final report and that no one has been ruled out as a suspect. [The manager] could not give him a time line."

For the next four months, February, March, April and May, the manager sent letters to Frank informing him that, according to the LAPD, the investigation of

Rosamaria's death still is ongoing and no one has been ruled out as a suspect in her homicide and that it would await the results of the investigation before discharging its obligation.[2]  On May 25, 2010, Frank called the manager asking for the status of the claim.  The manager told Frank he would contact LAPD.  According to the manager's notes, the initial detective said that Frank "is still considered a 'prime' suspect in the death of his wife."  On June 18, 2010, Farmers sent Frank a letter, again informing him that the investigation of Rosamaria's death still is ongoing, that no one has been ruled out as a suspect in her homicide and that it would await the results of the investigation before discharging its obligation.

Frank retained counsel, who sent Farmers a letter on July 14, 2010.  Counsel requested various documents from Farmers and asked for confirmation that Frank's "claim was complete and that [it] [had] received all the supporting documents needed to process his claim . . . ."  Counsel also requested confirmation that "the *only* reason the benefits have not been paid to [Frank] is due to the possibility that he may have been involved in the killing of his wife. [¶] We would appreciate knowing whether anyone has accused [Frank] of having been involved in any way in the killing of his wife; and, if so, who has made the accusation. [¶] We would also appreciate knowing whether anyone other than [Frank] has made a claim to the benefits of [Rosamaria's] life insurance policy. [¶] Finally, we would appreciate knowing whether your company . . . or someone acting on behalf of your company has undertaken its own investigation regarding

---

[2]     Rosamaria had a second life insurance policy with another insurer providing $235,000 in benefits upon her death.  She listed Frank as the sole primary beneficiary, with no contingent beneficiaries, on that policy as well.  On March 22, 2010, that insurer sent a letter to Frank informing him that, "We are currently unable to process your claim for benefits under the above named life insurance coverage for Rosamaria . . . due to the manner of death listed on [her] death certificate and that the police investigation is still ongoing.  At this point in time there are two options available to you:  (1) Agree to allow us to pend . . . review of this claim for three (3) months and then follow up on the police investigation; or (2) We can file a legal proceeding to allow the courts to determine how to distribute the proceeds from this coverage.  Please contact our office in writing as to which of the above options you would like to pursue."  Frank requested that the insurer hold the claim for three months.

[Rosamaria's] demise or whether it is relying solely on the investigation by the [LAPD] . . . ."[3] Based on the receipt of this letter, "and the fact that [the manager] was informed that [Frank] was still considered a 'prime suspect' in the murder of Rosamaria . . . , [the manager] referred this matter to [Farmers'] legal department and, subsequently, a decision was made to interplead the life insurance proceeds."

2.      *The Interpleader Action and Award of Attorney Fees and Costs*

On August 3, 2010, Farmers filed a complaint in interpleader identifying Frank's claim for the policy benefits and alleging that, based on LAPD's investigation of Frank as a suspect in the homicide of Rosamaria, "[a]s there is no other primary or contingent beneficiary, should Frank . . . be convicted of murdering Rosamaria . . . , the life insurance benefits would go to [her] estate." Farmers named Frank as a defendant and alleged, "[o]n information and belief, [that] no probate action has been filed, and no administrator named, in connection with the death of Rosamaria . . . . If an administrator has been named, [Farmers] will amend the complaint to name the administrator of Rosamaria[']s . . . estate as a defendant. If no administrator has been named, [Farmers] will request that the Court assign a representative to protect the estate's potential claim."

Farmers alleged that, "[b]ecause [LAPD] has not ruled out Frank . . . as a suspect, [Farmers] has been unable to determine the appropriate payee for the death benefit proceeds. The claim made by Frank . . . and the potential claim of Ros[a]maria[']s . . . estate are adverse should Frank . . . be accused of Ros[a]maria[']s . . . murder. [Farmers] is unable to safely determine which, if any, of the claims [is] valid." Farmers "is indifferent with respect to whether it should pay the death benefits to Frank . . . or the estate of Ros[a]maria . . . . [Farmers] claims no interest in the proceeds and is a disinterested stakeholder." Farmers alleged that it would deposit $154,587, the amount of the policy benefit plus interest, with the court and that it had incurred attorney fees and

---

[3]      Counsel sent a similar letter to the other insurer pending Frank's claim for policy benefits based on Rosamaria's death, as that insurer did not pay Frank's claim at the end of the three-month period for which he had agreed it could hold the claim during the LAPD investigation. Apparently, at some later point, that insurer paid Frank the policy benefits.

costs as a result of the proceeding.  Farmers prayed for a judgment ordering Frank to interplead and litigate his claim to the death benefits proceeds, appointment of an estate administrator if necessary, a discharge of its liability and an award "from the death benefit proceeds deposited with the . . . [c]ourt its costs and reasonable attorney[] fees incurred in this action . . . ."

On October 1, 2010, Frank answered the complaint, asserting no affirmative defenses.  He also, on October 19, 2010, filed a first amended cross-complaint, asserting a cause of action for declaratory relief against Farmers and Rosamaria's mother, as the person who would receive the policy benefits through Rosamaria's estate if he were found to have feloniously and intentionally killed Rosamaria.  Frank asked for a judicial determination that he was entitled to the $150,000 in benefits on Rosamaria's policy.  Frank also asserted causes of action against Farmers for breach of contract and bad faith based on its failure to pay him the policy benefits despite his filing a claim for them.

On November 22, 2010, Farmers answered the first amended cross-complaint, and then, on January 7, 2011, filed a first amended complaint in interpleader in which it added Rosamaria's mother as a defendant.  According to Farmers, because Rosamaria died without a will and had no living children, her mother, by virtue of her estate, had a claim to the life insurance proceeds if Frank were not entitled to receive them.

Rosamaria's mother did not answer or otherwise respond to the first amended complaint in interpleader.  The clerk entered a default against her on March 18, 2011.  In the entry of default Farmers represented that it would seek attorney fees and costs from the funds deposited with the court.  On September 1, 2011, Frank moved for an order releasing the noncontested portion of the interpleaded funds to him, i.e., the $150,000, plus interest, in policy benefits less the $7,997.49 in attorney fees and costs requested by Farmers.  According to Frank, because Rosamaria's mother had defaulted in the action, he was the only interested stakeholder and, therefore, entitled to the funds.  Soon after the filing of the motion, on September 19, 2011, the trial court entered a default judgment against Rosamaria's mother.  In that judgment, the court ordered that Frank was entitled to the benefits on Rosamaria's policy.  On November 1, 2011, Farmers filed an

6

opposition to Frank's motion for release of the interpleaded funds. Farmers maintained that the funds should be held until Frank dismissed his first amended cross-complaint for breach of contract and bad faith. The court, on November 7, 2011, granted Frank's motion and ordered the clerk to pay Frank the interpleaded funds, $154,587 (plus any accrued interest), less the $7,997.49 requested by Farmers in attorney fees and costs. Frank received a check from the court payable to him in the amount of $146,589.51.

On December 6, 2011, Farmers moved for an order discharging and dismissing it from the interpleaded portion of the action and awarding it costs and attorney fees of $7,997.49. Frank opposed the motion, arguing that Farmers was not entitled to attorney fees and costs or a discharge of liability because it was never faced with a potential viable claim that could give rise to liability and the equities did not favor such an award. Frank submitted the declaration of an insurance industry expert, who opined that "Farmers did not act reasonably and within the standards of the insurance industry in the handling of [Frank's] claim in its investigation and payment of benefits . . . ." On January 19, 2012, the trial court issued an order discharging Farmers from the interpleader action. According to the court, "The policy would have been payable to [Rosamaria's mother] if [Frank] had been found to have murdered [Rosamaria], [Code of Civil Procedure] [s]ection 386[, subdivision] (b)[,] only requires a potential for different claims to an insurance policy for the interpleader to be permissible, and Farmers . . . had information that [Frank] was the prime suspect in the murder of his wife, the insured. This seems to be a situation [that] is appropriate for judicial interpleader." The court awarded Farmers attorney fees of $7,506.30 plus $491.19 in costs and directed the clerk to pay Farmers that amount, which was the balance of the interpleaded funds.

On March 19, 2012, the court entered judgment, discharging Farmers' liability regarding the death benefits on Rosamaria's policy and awarding it $7,997.49 in attorney fees and costs. Frank dismissed his first amended cross-complaint without prejudice and filed a notice of appeal from the judgment.

7

**DISCUSSION**

1.    *The Purpose of Interpleader and the Statutory Allowance for an Award of Attorney Fees and Costs to the Interpleading Party*

"Any person, firm, corporation, association or other entity against whom double or multiple claims are made, or may be made, by two or more persons which are such that they may give rise to double or multiple liability, may bring an action against the claimants to compel them to interplead and litigate their several claims." (Code Civ. Proc., § 386, subd. (b).) "'The purpose of interpleader is to prevent a multiplicity of suits and double vexation. [Citation.] "The right to the remedy by interpleader is founded, however, not on the consideration that a [person] may be subjected to double liability, but on the fact that he is threatened with double vexation in respect to one liability." [Citation.]' [Citation.]" (*Shopoff & Cavallo LLP v. Hyon* (2008) 167 Cal.App.4th 1489, 1513.) "An interpleader action, however, may not be maintained 'upon the mere pretext or suspicion of double vexation; [the plaintiff] must allege facts showing a reasonable probability of double vexation' [citation], or a 'valid threat of double vexation.' [Citation.]" (*Westamerica Bank v. City of Berkeley* (2011) 201 Cal.App.4th 598, 608.)

"'In an interpleader action, *the court initially* determines the right of the plaintiff to interplead the funds; if that right is sustained, an interlocutory decree is entered which requires the defendants to interplead and litigate their claims to the funds.' [Citation.] Then, in the second phase of an interpleader proceeding, the trial court also has 'the power under [Code of Civil Procedure] section 386 to adjudicate the issues raised by the interpleader action including: the alleged existence of conflicting claims regarding the interpleaded funds; plaintiffs' alleged position as a disinterested mere stakeholder; and ultimately the disposition of the interpleaded funds after deducting plaintiffs' attorney fees.' [Citation.]" (*Shopoff & Cavallo LLP v. Hyon*, *supra*, 167 Cal.App.4th at pp. 1513-1514; see also *Dial 800 v. Fesbinder* (2004) 118 Cal.App.4th 32, 43 ["interpleader proceeding is traditionally viewed as two lawsuits in one. The first dispute

8

is between the stakeholder and the claimants to determine the right to interplead the funds.  The second dispute to be resolved is who is to receive the interpleaded funds"].)

Regarding attorney fees and costs, "[a] party to an action who follows the procedure [for interpleader] set forth in [Code of Civil Procedure] [s]ection 386 . . . may insert in his motion, petition, complaint, or cross complaint a request for allowance of his costs and reasonable attorney fees incurred in such action.  In ordering the discharge of such party, the court may, in its discretion, award such party his costs and reasonable attorney fees from the amount in dispute which has been deposited with the court.  At the time of final judgment in the action the court may make such further provision for assumption of such costs and attorney fees by one or more of the adverse claimants as may appear proper."  (Code Civ. Proc., § 386.6, subd. (a).)

2.    *The Award of Attorney Fees and Costs in This Interpleader Action Was Proper*

a.    *The Funds Deposited with the Court Were "In Dispute"*

Frank contends that the attorney fees and costs award was improper because the funds Farmers deposited with the court were never "in dispute" as required by statute.  (See Code Civ. Proc., § 386.6, subd. (a) [court has discretion to award costs and reasonable attorney fees from amount "in dispute" deposited with the court].)  According to Frank, "[b]ecause no one other than [himself], the subject policy's named beneficiary, claimed the funds, they were never 'in dispute' as that term is used in [Code of Civil Procedure] section 386.6."  We disagree.

The first amended complaint in interpleader defined the dispute over the policy benefits.  On the one hand, Frank filed a claim to obtain the benefits as the sole beneficiary on the policy.  On the other hand, Frank was a suspect, at one point "a 'prime' suspect in the death of his wife," and LAPD had an ongoing investigation into Rosamaria's death.  If Frank were found to have feloniously and intentionally killed Rosamaria, he would not have been entitled to the policy benefits, and they would have been payable to Rosamaria's mother through her estate.  (See Probate Code, § 252 ["named beneficiary of a bond, life insurance policy, or other contractual arrangement who feloniously and intentionally kills the principal obligee or the person upon whose

9

life the policy is issued is not entitled to any benefit under the bond, policy, or other contractual arrangement, and it becomes payable as though the killer had predeceased the decedent"].) Because of the ongoing investigation, Farmers recognized a dispute over how it should handle payment of the policy benefits. It thus initiated the interpleader proceeding.[4] That Rosamaria's mother defaulted in the action, and the trial court determined Frank was entitled to the funds, does not mean the funds were not in dispute. Indeed, whether Frank killed Rosamaria could have been litigated in the interpleader proceeding. (See *Shopoff & Cavallo LLP v. Hyon*, *supra*, 167 Cal.App.4th at p. 1514 [court in interpleader proceeding determines "alleged existence of conflicting claims regarding the interpleaded funds" and "ultimately the disposition of the interpleaded funds"]; see also Probate Code, § 254 [determination that beneficiary feloniously and intentionally killed insured may be based on "final judgment of conviction of felonious and intentional killing" or court determination by preponderance of evidence whether the killing was felonious and intentional].) The interpleaded funds thus were "in dispute" for purposes of an attorney fees and costs award under Code of Civil Procedure section 386.6, subdivision (a).

b.    *The Argument Against the Attorney Fees and Costs Award Based on a Theory of Immunization from Double Liability Fails*

Frank next contends that, based on Insurance Code section 10172, Farmers would have been immunized from double liability if it had paid him the policy benefits while LAPD continued to investigate Rosamaria's death and, as a result, the interpleader action was unnecessary. He essentially maintains that the trial court erred in awarding attorney fees and costs under Code of Civil Procedure section 386.6, subdivision (a), because Farmers did not have grounds for an interpleader action under Code of Civil Procedure section 386, subdivision (b).

---

[4]    The original complaint also recognized the dispute between Frank's claim to the policy benefits, on the one hand, and Rosamaria's estate, on the other hand. The first amended complaint simply named Rosamaria's mother as a defendant, whereas the original complaint had requested appointment of an administrator for Rosamaria's estate if one had not already been named.

10

Frank forfeited the right to contest the propriety of the interpleader action by not doing so during the initial phase of the proceeding. "A defendant in interpleader has the right to put in issue the question as to whether or not the facts were such as to entitle the plaintiff to compel the defendants to interplead. It has therefore been held in effect that, if the defendants in interpleader have fully litigated their claims without objection, they will be deemed to have consented to the remedy invoked and granted, and will not later be heard to object that the plaintiff's complaint did not state a cause of action for interpleader . . . . [Citation.]" (*Conner v. Bank of Bakersfield* (1920) 183 Cal. 199, 202-203.) As a result, when a defendant does "not raise the issue of the right of the plaintiff to use the remedy of interpleader while litigating th[e] matter before the trial court, the question may not be raised on appeal." (*O'Connell v. Zimmerman* (1958) 157 Cal.App.2d 330, 337.)

Here, Frank did not question Farmers' use of the remedy of interpleader, but rather litigated the matter in the trial court. As noted, the court initially determines the right of the plaintiff to interplead the funds. (*Shopoff & Cavallo LLP v. Hyon*, *supra*, 167 Cal.App.4th at p. 1513.) Frank did not contest Farmers' decision to interplead the funds. Rather, he answered the original complaint, without asserting any affirmative defenses, and stipulated to the filing of the first amended complaint adding Rosamaria's mother as a defendant. He did not answer or otherwise respond to the first amended complaint, simply requesting that the court release the interpleaded funds to him once Rosamaria's mother had defaulted in the action. Frank, therefore, cannot challenge the award of attorney fees and costs on the ground that Farmers was not entitled to bring an interpleader action.

Frank argues that he did not forfeit an objection to the interpleader action. He cites *Wells Fargo Bank, N.A. v. Zinnel* (2004) 125 Cal.App.4th 393 for support. In that case, the appellate court held that the trial court properly had granted the bank's motion to discharge its liability in an interpleader action but reversed an award of attorney fees and costs on the ground that the bank did not satisfy the statutory interpleader requirement in Code of Civil Procedure section 386 to deposit the amount of funds in

11

dispute with the court. (*Id*. at p. 403.) The appellate court, however, did not address the question whether the bank had been entitled to maintain an interpleader action—the issue that Frank forfeited here. (See *id*. at p. 400 [declining to address defendant's argument that the bank had no right to interplead because she was entitled to the funds].) Nor does it appear that the bank raised an issue of forfeiture. The question of forfeiture, therefore, was not before the appellate court, which simply decided that the bank did not have a right to attorney fees and costs because it had failed to fulfill one of the statutory requirements for such an award. The case thus does not support Frank's argument against forfeiture.

In any case, even on its merit, Frank's argument against interpleader based on a theory of immunization from double liability is not persuasive. Frank relies on Insurance Code section 10172, which provides, "Notwithstanding [s]ections 751 and 1100 of the Family Code and [s]ection 249.5 of the Probate Code, when the proceeds of, or payments under, a life insurance policy become payable and the insurer makes payment thereof in accordance with the terms of the policy, or in accordance with the terms of any written assignment thereof if the policy has been assigned, that payment shall fully discharge the insurer from all claims under the policy unless, before that payment is made, the insurer has received, at its home office, written notice by or on behalf of some other person that the other person claims to be entitled to that payment or some interest in the policy." According to Frank, this statute means that, if Farmers had paid him the policy benefits as the sole beneficiary on Rosamaria's policy and he subsequently were determined to have feloniously and intentionally killed Rosamaria, Farmers would have been immune from double liability to Rosamaria's estate because it had not received written notice of another claimant. We disagree that the statute rendered the interpleader action unnecessary.

Insurance Code section 10172 applies when the proceeds of a life insurance policy "become payable and the insurer makes payment thereof in accordance with the terms of the policy." Given that, at the time Farmers initiated the interpleader action, Frank was a suspect in his wife's homicide, and thus might not have been entitled to the policy

12

benefits based on Probate Code section 252, the proceeds of Rosamaria's policy had not necessarily, as Frank suggests, "become payable." (Ins. Code, § 10172.) The interpleader action was an authorized method to determine to whom the proceeds were payable. Moreover, if Frank were found to have feloniously and intentionally killed Rosamaria, Probate Code section 252, combined with the policy language, would have required that Farmers pay the benefits to Rosamaria's estate. The interpleader action enabled Farmers to make a payment "in accordance with the terms of the policy." (*Ibid*.) In any case, Insurance Code section 10172, which refers to Family Code sections 751 and 1100 and Probate Code section 249.5, all addressing interests in and disposition of community property, appears to relate to community property claims on life insurance policy proceeds. (*Leonard v. Occidental Life Ins. Co.* (1973) 31 Cal.App.3d 117, 123 [insurer immunized from double liability when it paid policy benefits to beneficiary before deceased insured's wife made community property claim to proceeds].) Farmers' interpleader action, therefore, was not unnecessary based on a purported immunization from double liability under Insurance Code section 10172.

The more relevant statute appears to be Probate Code section 256, part of the Probate Code addressing the "[e]ffect of homicide" on the "[l]iability of an insurance company." Probate Code section 256 provides, "An insurance company, financial institution, or other obligor making payment according to the terms of its policy or obligation is not liable by reason of this part, unless prior to payment it has received at its home office or principal address written notice of a claim under this part." The language of this statute also did not render the interpleader action unnecessary based on a purported immunization from double liability. Probate Code section 256 requires the insurer to make payment "according to the terms of its policy or obligation." Although Rosamaria listed Frank as the sole beneficiary on her policy, under the policy terms, if Frank were to predecease Rosamaria, the benefits were to be paid to Rosamaria or her estate. And Probate Code section 252 would have required Farmers to pay the policy benefits as though Frank had predeceased Rosamaria if he were determined to have feloniously and intentionally killed Rosamaria. The interpleader action thus was a venue

13

for Farmers to determine how to "mak[e] payment according to the terms of its policy or obligation" under Probate Code section 256.

The purpose of interpleader is to litigate an issue of one liability. (*Shopoff & Cavallo LLP v. Hyon*, *supra*, 167 Cal.App.4th at p. 1513.) Farmers knew it faced one liability with respect to the proceeds on Rosamaria's life insurance policy. But it wanted to know to whom it was liable. Given Frank's status as a suspect in Rosamaria's homicide, and the statutory requirement that Farmers administer the policy as though Frank had predeceased Rosamaria if he were found to have feloniously and intentionally killed her, a reasonable probability of double vexation existed at the time Farmers filed the interpleader action. (See *Westamerica Bank v. City of Berkeley*, *supra*, 201 Cal.App.4th at p. 608.) Indeed, it would be contrary to the statutory scheme for interpleader and Probate Code section 252, prohibiting a beneficiary who feloniously and intentionally kills the insured from receiving the life insurance proceeds, to encourage an insurer to pay the policy benefits to a "suspect" beneficiary simply as a means of discharging its liability and walking away from the matter. In contrast, the route taken by Farmers of filing an interpleader action to exhaust the possibility of double vexation furthers the statutory goals. As a result, the attorney fees and costs award is not erroneous based on the argument that Farmers filed an unnecessary interpleader action.

c.     *Farmers Did Not Cease Being a Disinterested Stakeholder to Preclude an Award of Attorney Fees and Costs*

Frank contends that, during the interpleader litigation, Farmers ceased being a disinterested stakeholder such that awarding it attorney fees and costs was erroneous under the statutory scheme for interpleader. According to Frank, when Farmers opposed his motion to release the interpleaded funds on the ground that the funds should not be distributed until he dismissed his first amended cross-complaint asserting causes of action for breach of contract and bad faith, it ceased being a disinterested stakeholder and thus could not qualify for an award of attorney fees and costs.

At the time Farmers opposed his motion for release of the funds, however, the interpleader issues already were resolved. Farmers deposited the funds in dispute with

the trial court and asserted its status as a disinterested stakeholder. Rosamaria's mother defaulted in the action, and the court determined that Frank was entitled to the interpleaded funds. That Farmers sought a dismissal of Frank's first amended cross-complaint does not suggest it was asserting an interest in the interpleaded funds. In fact, Farmers never claimed an interest in the funds. The court recognized as much by granting Frank's motion to release the funds. As a result, Farmers' attempt to obtain a dismissal of the first amended cross-complaint did not alter its status in the litigation so as to disqualify it from an award of attorney fees and costs.

        d.      *The Award of Attorney Fees and Costs Was Not an Abuse of Discretion*

Frank's last contention is that the trial court abused its discretion by awarding attorney fees and costs in this case. Frank maintains that "it should be held to be an abuse of discretion for a court to award a life insurance company costs and attorney fees in an interpleader action because that is a cost of doing business that should be spread among all policy holders, not just those designated beneficiary claimants who, the carrier decides, might become subject to an adverse claim. If so, the singular fact that Farmers filed its complaint in interpleader without having received an adverse claim, in and of itself, would preclude it from being awarded costs and attorney fees under an abuse of discretion standard." We disagree.

The statutory scheme for interpleader contemplates an award of attorney fees in the trial court's discretion. Nothing in that scheme suggests that life insurance companies should be exempt from such an award as a routine cost of doing business. Indeed, to read such an exception into the provision for attorney fees and costs would conflict with the statutory language that "[*a*] *party* to an action who follows the procedure [for interpleader] set forth in [Code of Civil Procedure] [s]ection 386 . . . may insert in his motion, petition, complaint, or cross complaint a request for allowance of his costs and reasonable attorney fees incurred in such action." (Code Civ. Proc., § 386.6, subd. (a), italics added.) The provision does not contemplate that a trial court may exercise its discretion to award attorney fees and costs to only a particular type of party.

Frank's additional point that a trial court abuses its discretion by awarding attorney fees and costs to a life insurance company that files an interpleader action before it has received an adverse claim is contrary to our decision. As noted, because Frank would not have been entitled to the policy benefits if he were found to have feloniously and intentionally killed Rosamaria, either by a final judgment of conviction or by a court determination by a preponderance of the evidence of a felonious and intentional killing, a potential for adverse claims existed such that Farmers could interplead the policy benefits. The absence of Farmers' actual receipt of an adverse claim did not cause the interpleader action to be unnecessary, nor prevent Farmers from recovering attorney fees and costs under the same statutory scheme for interpleader. The court, therefore, did not abuse its discretion by awarding Farmers attorney fees and costs even though it had not received adverse claims.

Frank's further arguments for abuse of discretion, namely that the funds were not in dispute, that Farmers would not have been exposed to double liability by paying him the policy benefits and that Farmers ceased being a disinterested stakeholder, simply repeat his theories for reversal of the attorney fees and costs award. Those arguments are ones we already have rejected and thus do not suggest the trial court abused its discretion by awarding Farmers its attorney fees and costs.

## DISPOSITION

The judgment is affirmed.  The parties shall bear their own costs on appeal.

**CERTIFIED FOR PUBLICATION.**


ROTHSCHILD, J.

We concur:


MALLANO, P. J.


CHANEY, J.

17