Filed 12/9/19

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

|  |  |
|---|---|
| GREGORY S. HOOD,<br><br>    Plaintiff and Respondent,<br><br>               v.<br><br>JOHN-DAVID GONZALES,<br><br>    Defendant and Appellant, | D074006<br><br><br><br>(Super. Ct. No. 37-2017-00027246-CU-MC-CTL) |

APPEAL from orders of the Superior Court of San Diego County, Eddie C. Sturgeon, Judge.  Affirmed.

Daniel J. Lickel, for Defendant and Appellant.

William Iagmin and Jon R. Williams, for Plaintiff and Respondent.

Defendant and appellant John-David Gonzales (Gonzales) appeals the orders of the trial court that led to the disbursement of settlement funds to respondents Michael Silvers, a law corporation (Silvers), Panish, Shea & Boyle (PSB), Michael W. Jacobs

(Jacobs), Case Advance (CA),[1] Nexus Physical Therapy (Nexus), and Everence Association, Inc. (Everence) (Silvers, PSB, Jacobs, CA, Nexus, and Everence are sometimes collectively referred to as lienholders).[2] Gonzales and lienholders (sometimes collectively defendants) were named as parties in the instant interpleader action filed by plaintiff, respondent, and stakeholder Gregory S. Hood (Hood).

Hood filed this action to resolve the competing claims of defendants to funds from the settlement of *Gonzales v. Sears Holding Corporation et al.*, San Diego Superior Court case No. 27-2014-00040057-CU-PL-CTL (sometimes, personal injury action), which litigation was filed by Silvers in November 2014 after Gonzales sustained personal injuries in a bicycle accident. Gonzales in July 2015 agreed in writing to have PSB associate in as counsel. Silvers/PSB settled a portion of the personal injury action for $100,000.

After Silvers/PSB withdrew as counsel of record in the personal injury action, Gonzales retained Jacobs, who obtained an additional settlement of $299,999.99 pursuant to an offer to compromise under Code of Civil Procedure section 998 (section 998). Gonzales, however, refused to sign the settlement agreement and endorse the

[1] Case Advance was improperly named in the complaint as "Cash Advance."

[2] Nexus was a healthcare provider and Everence a supplemental insurer that provided services to Gonzales in connection with the personal injury action. Neither entity submitted a brief in this appeal.

2

$299,999.99 check (sometimes, settlement check), terminated Jacobs as legal counsel, and retained Hood for the " 'determination and distribution' of the settlement funds."

Despite his promise to do so, Gonzales again refused to endorse the settlement check. Within days after retaining Hood, Gonzales terminated him as legal counsel. Hood in response informed Gonzales that, if he did not promptly retain new counsel to allow for the transfer of the settlement check and other settlement funds in Hood's possession, Hood would file an interpleader action, based on Hood's concern there were multiple claimants to the settlement funds and the settlement check would "expire" and not be honored by a bank.

Hood filed the instant action, and turned over the settlement funds and settlement check to the court clerk, after receiving no response from Gonzales. Hood subsequently moved for an appointment of an elisor[3] to endorse the check, and for dismissal from the action and an award of costs and fees of $7,772.50 pursuant to Code of Civil Procedure section 386.5, which relief the court granted on September 14, 2017 (sometimes, elisor order).

---

[3] "As used in the case at bar, consistent with its common legal meaning, an elisor is a person appointed by the court to perform functions like the execution of a deed or document." (*Blueberry Properties, LLC v. Chow* (2014) 230 Cal.App.4th 1017, 1020 (*Chow*).)

3

In anticipation of an October 27, 2017 hearing, the lienholders stipulated to a proposed distribution of the settlement funds among defendants. At the October 27 hearing, Gonzales (through his fifth attorney of record) agreed with the amounts owed to Silvers, PSB, and CA under that stipulation. Gonzales, however, disputed the amount sought by Jacobs, Nexus, and Everence. He also disagreed with the court's September 14 elisor order awarding costs and fees to Hood.

Based on the proposed stipulation of the lienholders and Gonzales's concession that Silvers, PSB, and CA were entitled to reimbursement of costs and loans they had advanced him, the court made a ruling from the bench, which resulted in its November 30, 2017 order (sometimes, distribution order). After reducing Jacobs's award under the proposed stipulation by $40,000 and increasing Gonzales's award by that same amount, the court distributed the funds as follows: Silvers ($60,77.03); PSB $50,884.58);

Jacobs ($119,993); CA ($22,217.41); Nexus ($493.06); Everence ($500)[4]; and Gonzales

($119,671.03.)[5]

Gonzales makes a series of arguments in requesting this court reverse the elisor

and distribution orders, including arguing for the first time on appeal that the trial court

prejudicially erred in allowing the interpleader action to proceed as the vehicle or means

to distribute the settlement funds to defendants (including himself); and in appointing an

elisor to endorse the settlement check, without first ordering him to do so. As we

explain, we find these arguments and others raised by Gonzales unavailing and thus

affirm the court's orders.

---

[4]    Jacobs in the interpleader action alleged that Nexus was owed $1,232.64, but agreed to accept $493.06 as payment in full; and that Everence was owed $4,000, but agreed to accept $500 as payment in full. Gonzales disputed that either entity was owed anything.

[5]    Somewhat surprisingly, the record is not entirely clear on the amount of settlement funds Gonzales ultimately received from the personal injury action. At an October 27, 2017 hearing, Jacobs represented that, if $79,671.03 was distributed to Gonzales as *proposed* under the lienholders' stipulation, "that would bring up [Gonzales's] total amount of proceeds in this case to $238,502," inasmuch as "[h]e's already gotten the loan[s] [and] [h]e's already gotten the benefit of all of these costs. That alone would mean he's going to get 59.6 percent of the gross proceeds. That's a pretty good deal." As it turns out, Gonzales *actually* received $119,993, or $40,000 more than had been proposed under the lienholders' stipulation, bringing Gonzales's total recovery (using Jacobs's math) to 69.6 percent of the gross proceeds (i.e., $278,502 of $400,000), ostensibly as a result of loans and costs also advanced on his behalf.

FACTUAL AND PROCEDURAL SUMMARY

As noted, Gonzales retained Silvers after Gonzales suffered injuries in a bicycle accident. During the course of representing Gonzales, Silvers advanced $60,744.03 in loans and costs. Once PSB associated into the personal injury action, it too advanced loans and costs to Gonzales in the amount of $50,844.58.

In November 2016, Gonzales agreed to settle a portion of his personal injury action. At the time he was represented by Silvers/PSB. In late January 2017, counsel for settling party Cano Trading Corporation dba North Park Bikes (Cano) transmitted a $99,531.12 check to PSB, which it deposited in its client trust account.[6] Following the Cano settlement, Silvers/PSB withdrew their joint representation of Gonzales.

As outlined in a September 15, 2017 letter addressed to the trial judge, which Gonzales attached to a September 20, 2017 declaration he filed with the court, Gonzales stated that he had not "fired" Silvers/PSB and that they withdrew as legal counsel in what he described as a "carefully calculated, and aggressive plan to sabotage [his] case," which he alleged they continued to do through their "illegal and unethical collusion . . . with any [a]ttorney associated with [his] case." (Emphasis in original omitted.) Gonzales also accused Silvers/PSB of forcing him to "sign an illegal, unethical, improper, invalid

---

6    Although the settlement was for $100,000, that amount was reduced by $468.88 to pay a Medicare lien owed by Gonzales.

6

'Affirmation Agreement on March 30, 2017—$100,000,' " which affirmed his obligation to reimburse Silvers/PSB for loans and costs they had in the personal injury case.

Gonzales agreed that $50,000 of the $100,000 Cano settlement funds (minus the small lien amount) would go to Jacobs, his then "new attorney," who agreed to advance Gonzales $5,000 out of such funds, with the balance to be placed in Jacobs's client trust account to "cover costs and expenses associated with the . . . ongoing litigation." In addition to advancing $5,000 to Gonzales, Jacobs expended $7,755.50 in costs, which amount he deducted from the funds, leaving a balance of $37,244.50. PSB kept the rest of the Cano settlement funds in its own client trust account "to cover in part the amounts currently owed" Silvers/PSB.

Jacobs, with the consent of Gonzales, made a section 998 offer to compromise to Pacific Cycle, Inc. (PCI), the remaining defendant in the personal injury action. Gonzales later sought to rescind that offer after it had been accepted by PCI. In his September 20 declaration, Gonzales stated that there had been more than enough time for the offer to be rescinded; that Jacobs "ignored" his requests to do so; and that he also ended up terminating Jacobs as legal counsel.

Gonzales explained his reasons for terminating Jacobs, and subsequently Hood, in his September 20 declaration, stating as follows: "Jacobs representation should be of the most concern to your Honor. [¶] a) As I mentioned on September 14, 2017, for over an hour JACOBS on May 3, 2017 . . . berated me, called me a liar, spoke unmentionable

7

phrases which then lead to his obsession with his Attorney Fees, and to get out of my case. [¶] b) JACOBS colluded with the Defendant #1 Legal team on many issues, and had the Defendant #1 Legal Reprsentative [*sic*] issue the PCI check - $299,999.99 in JACOBS [*sic*] name only.  The check then had to be reissued, requiring JACOBS and Plaintiffs [*sic*] signature.

"c) JACOBS had the nerve to have an Expert contact me out of the blue, in order to justify JACOBS [*sic*] 998 Offer. [¶] d) When called out, JACOBS agreed to reduce his Attorney Fees in writing to 12-25% of the PCI - $299,999.99 via a May 22, 2017, 'Addendum to Retainer Agreement,' which is not mentioned in HOODS [*sic*] Interpleader action. [¶] e) JACOBS then colluded with HOOD to pursue Attorney Fees of $160,000.00, which is mentioned in HOODS [*sic*], July 26, 2017, Interpleader action. Previously, HOOD in writing stated JACOBS was only entitled to 'Quantum meruit.'

"The FIRING of Attorney JACOBS and HOOD was solely due to their incompetence, and unwillingness to protect and secure my rights as a Litigant.  What is most concerning, is even after both were FIRED, they continued to act in their best

8

interest by filing various actions with the court."[7]

As noted, Hood was the fourth attorney Gonzales hired to represent him in the personal injury action. Gonzales retained Hood in June 2017 to facilitate the distribution of settlement funds from the personal injury action in light of the competing claims to certain of those funds by Gonzales, his prior attorneys of record, and others, as noted. Jacobs transferred $37,244.50 to Hood, the amount left in Jacobs's client trust account, and endorsed the settlement check over to Hood's client trust account. Based on Gonzales's representation that he would endorse the settlement check for deposit into Hood's client trust account, and per their agreement on June 30, 2017 that Hood should "pay himself," Hood in early July 2017 transferred $4,500 from his client trust account to his business account. Despite his earlier agreement to do so, Gonzales again refused to endorse the settlement check from PCI.

In mid-July 2017, Gonzales terminated Hood. In response, Hood informed Gonzales that he either would agree to transfer to a new attorney retained by Gonzales

---

[7] The record also shows Gonzales on other occasions accused his attorneys of engaging in myriad acts of inappropriate and unlawful conduct. For example, in his five-page, single-spaced June 20, 2017 letter jointly addressed to Silvers, PSB, and Jacobs, Gonzales accused them of being unethical, breaching their fiduciary duty to him, and using undue influence to take advantage of him. On June 15, 2017, he wrote a separate letter to Jacobs, accusing him of engaging in over "TWENTY incidents where [his] actions and behaviors have been unbecoming of an Attorney," of being unfair, and other acts of "mortal [sic] turpitude." The record also includes an attachment by Gonzales titled "Recap of Mr. Jacobs [sic] Actions—Attorney Fee," which is a five-page, single-spaced document describing how Jacobs allegedly "planned act[s] of deception and act[s] of moral turpitude" during his representation of Gonzales.

the money remaining in Hood's client trust account, $32,744.50, and the settlement check, or file an action in interpleader. When Gonzales did not reply, Hood in late July filed the instant interpleader action, and deposited the balance of the Cano settlement funds from his trust account with, and delivered the unendorsed settlement check to, the court clerk. As noted *ante*, Hood named Gonzales, and the lienholders as defendants in the instant action.

On or about August 10, 2017, Hood moved for the appointment of an elisor. (See Super. Ct. San Diego County, Local Rules, rule 2.5.11 (rule 2.5.11), discussed *post*.) At the same time, as stakeholder Hood requested he be awarded attorney fees and discharged from the action pursuant to Code of Civil Procedure sections 386.5 and 386.6, discussed *post*. Hood on August 18, 2017 served defendants by e-mail with all moving papers, including the "date, time, department and nature of said hearing," which was scheduled for September 14, 2017.

Gonzales appeared at the unreported September 14 hearing in propria persona. The court in its elisor order dated that same day granted Hood's request for appointment of an elisor; directed the clerk of the court to endorse the settlement check and deposit the money into a trust account; awarded Hood attorney fees and costs of $7,772.50, which number was derived from the declaration of Hood in support of his application (19.3 hours x $375 per hour + $435 filing fee + $100 in service of process fees/anticipated

10

additional work); and discharged Hood from the action. The court set a status conference for October 6, 2017.

As noted *ante*, shortly thereafter Gonzales filed his September 20 declaration, but did not otherwise respond to the interpleader complaint, unlike Silver, PSB, and Jacobs. The court at the unreported October 6 status conference reset the matter for October 27, 2017 as an "OSC re: Disbursement of Funds" and directed counsel to ensure a court reporter would be present for that hearing. The minute order of the October 6 hearing shows Gonzales again attended in propria persona. On or about October 20, PSB deposited with the court $49,531.12 from its client trust account, which represented the balance of the Cano settlement funds in its possession.

Because Gonzales had still not answered the complaint, Hood on October 23 requested entry of default and court judgment against Gonzales, which request was subsequently denied.[8] Gonzales filed an answer to the interpleader complaint on October 27, the same day as the hearing. As noted *ante*, the lienholders (i.e., Silvers, PSB, Jacobs, CA, Nexus, and Everence) submitted a proposed stipulation regarding the distribution of the settlement funds.

---

[8] Hood on or about October 12 had previously sought entry of default and a court judgment against Gonzales based on his failure to answer the interpleader complaint. The clerk of the court found that earlier request could not be processed, however, without additional information.

Attorney Daniel Lickel represented Gonzales at the October 27 hearing, after substituting into the case that same day. Although Gonzales claimed his September 20 declaration was an "answer" to the complaint, he nonetheless filed a formal answer out of an abundance of caution. In his answer, Gonzales admitted that it was "now the Court's job to determine whether there are valid liens held by the other claimants and in what amount if any." Gonzales also asserted various affirmative defenses against his four prior attorneys of record.

At the hearing, Gonzales asked to be heard first in order to "short circuit this a little bit." Gonzales (through counsel) stated: "So we did review the stipulation; my client and I reviewed the stipulation. First of all, we don't have any dispute with the amount that Case Advance wants. That's $22,217.41. We don't have any dispute with respect to what Mr. Silvers wants, which I understand to be $60,744.03. We don't have any dispute as to what [PSB] wants. . . . [¶] In any event, we're okay with the [$]50,884.58 that they want. So that—and based on the stipulation, it's our understanding that the parties do not dispute $79,671.03 going to my client. So my client would be willing to stipulate to the release of those funds to the Court." Gonzales, however, did dispute the amount claimed to be owed to Jacobs, Nexus, and Everence in the proposed stipulation, and the amount previously paid to Hood.

With respect to Jacobs, Gonzales argued his request for $160,000 was excessive because Jacobs began representing Gonzales after the Cano settlement of $100,000 had

12

been completed. Gonzales also argued that Jacobs "convinced" him to make the section 998 offer in an amount Gonzales "was not entirely comfortable with"; that on May 15 Gonzales e-mailed Jacobs requesting that offer be withdrawn because it was too low; that on the following day, PCI accepted the offer; that Jacobs had suggested to Gonzales in connection with the offer that, if Gonzales went forward with it, Jacobs would take significantly less in fees than the amount stated in the retainer agreement, which lesser amount was not reflected in the lienholders' proposed stipulation; and that Jacobs, to be paid anything, needed to file a cross-complaint for declaratory relief or take some similar action to allow the parties to litigate what amounts, if any, he was owed. Thus, Gonzales asked the court to continue the matter with respect to Jacobs.

With respect to Nexus, Gonzales argued its claim should have been submitted to Medicare and not reimbursed out of the settlement funds. With respect to Everence, Gonzales represented he had spoken to representatives of that company, who indicated they did not expect any payment from him. Finally, with respect to Hood, Gonzales argued he allegedly was not given sufficient notice to oppose the request for fees as allowed under section 386.5 of the Code of Civil Procedure, despite the fact he was served with the paperwork on August 18, and the hearing did not take place until September 14.

13

Jacobs in response argued that when he was retained, Gonzales wanted the case resolved as quickly as possible because it was "emotionally trying on [him]."[9] Jacobs noted he first met Gonzales on March 20, with trial about two months away. Although he had reservations about taking the case because the trial date already had been continued "a bunch of times" and he was a "solo" practitioner, Jacobs agreed to undertake the representation, after Gonzales reported Jacobs was the "44th lawyer [he'd] talked to since [Silver/PSB] withdrew."

Jacobs, however, could not front the costs to get the case ready for trial because there were eight experts who were "all over the place," making the personal injury action a "very expensive case" to try. Jacobs thus agreed to take the case on the condition that Gonzales would release some of the Cano settlement funds to pay the upfront costs of the litigation. As a result, PSB agreed to release half of the Cano funds to Jacobs, despite the fact Gonzales then owed Silvers/PSB $110,000 collectively in "hard costs and loans they had made" to him in connection with the personal injury action. Jacobs therefore argued that Gonzales was never going to recover any part of the $100,000 Cano settlement.

Jacobs at the hearing went on to applaud Silvers/PSB for their "gracious[ness]" in not seeking fees, but only their costs, and noted that more than 1,000 hours had been spent on the personal injury action by all of Gonzales's attorneys. Jacobs represented he

---

9    We note there was no objection to such argument based on the attorney-client privilege.

alone had spent 340.3 hours on the case and that under the retainer agreement signed by Gonzales, if fired Jacobs was entitled to $300/hour, or $102,090 in fees. Jacobs argued it was "eminently fair" that he receive 40 percent of $299,999.99, as provided in the retainer agreement, or about $120,000.

As noted *ante*, Jacobs further argued that if Gonzales received $79,671.03 as contemplated under the lienholders' proposed stipulation, "that would bring up his total amount of proceeds in this case to $238,502," inasmuch as "[h]e's already gotten the loan [and] [h]e's already gotten the benefit of all of these costs. That alone would mean he's going to get 59.6 percent of the gross proceeds. That's a pretty good deal." The record shows Gonzales did not dispute Jacobs on this point, despite the court asking if anyone else at the hearing wished to be heard.

Counsel for CA argued that, unlike the other lienholders, there was an attorney fees provision in the agreement between CA and Gonzales; and that, even though he "love[d] La Jolla," he was not "cheap" and making the drive from his office in West Los Angeles to San Diego to make additional court hearings would "burn through a lot of the net recovery that Mr. Gonzales otherwise could enjoy." Based on Gonzales' concession to the stipulation of the lienholders at least with respect to Silvers, PSB, and CA, counsel for CA requested the court at a minimum disburse the funds to these three lienholders.

The court, after hearing additional argument, announced its ruling from the bench. The court accepted the lienholders' stipulation except with respect to Jacobs, who would

15

receive about $120,000 instead of the $160,000 he initially sought. The court then took the $40,000 difference and added it to the amount Gonzales received, totaling $119,671.03, which amount did not include the costs and loans that had been advanced by his prior attorneys of record. The court ordered Jacobs to prepare an order.

Gonzales on November 2, 2017, filed an objection to the contemplated distribution order. He argued it "was entered after a rushed process that did not allow the parties time for discovery or presentation of testimony and documentary evidence." This included Gonzales's claims that Jacobs and Hood "should hold the funds in their trust account[s] while they complete fee arbitration" with him. He also argued that neither Nexus nor Everence should be paid anything (collectively, $993.06) because neither party had appeared at the hearing.

The court held a nonreported status conference on November 7, 2017. The minute order for that hearing shows the court signed the distribution order submitted by Jacobs. On November 21, Jacobs submitted a sworn declaration asking the November 7 order be revised because the court clerk had found a $7 mathematical error. The court in response issued the November 30, 2017 distribution order, reducing Jacobs's award accordingly.

16

DISCUSSION

I

Invited Error/Forfeiture

As noted, Gonzales argues the court erred in using the interpleader procedure to resolve defendants' competing claims to the settlement funds, and, in the course of so doing, appointing an elisor to endorse the settlement check that Gonzales himself twice refused to sign. As an initial matter, we conclude Gonzales on appeal is estopped from asserting such claims of error and/or has forfeited them.

"Under the doctrine of invited error, where a party, by his [or her] conduct, induces the commission of an error, he [or she] is estopped from asserting it as grounds for reversal. [Citations]. Similarly, an appellant may waive his [or her] right to attack error by expressly or impliedly agreeing at trial to the ruling or procedure objected to on appeal." (*Redevelopment Agency v. City of Berkeley* (1978) 80 Cal.App.3d 158, 166 (*Redevelopment Agency*); see *Mesecher v. County of San Diego* (1992) 9 Cal.App.4th 1677, 1687 [concluding a party's belated postverdict objection failed to preserve contention of error regarding jury instructions the party affirmatively approved]; accord *Jentick v. Pacific Gas & Elec. Co.* (1941) 18 Cal.2d 117, 121 [concluding the doctrine of invited error prevented the defendant gas company from attacking on appeal a jury verdict resulting from an erroneous instruction that the defendant twice prompted the trial court to give].) The purpose of the invited error doctrine is to "prevent a party from

17

misleading the trial court and then profiting therefrom in the appellate court."  (*Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 403 (*Norgart*).)

As summarized in detail *ante*, the record in the instant case shows that Gonzales had no issue with the court using the interpleader action to distribute settlement funds to him, or to reimburse defendants Silvers, PSB, and CA for the loans and costs they advanced in connection with his personal injury action.  Indeed, the record shows Gonzales wanted to go "first" at the October 27 hearing to "short circuit this a little bit" in order to acknowledge his indebtedness to these defendants in the amounts set forth in the lienholder's proposed stipulation; and that Gonzales conceded in the answer he filed on October 27 it was "now the Court's job to determine whether there are valid liens held by the other claimants and in what amount if any," which is exactly what the court did.

Based on the foregoing, we conclude Gonzales on appeal is estopped to assert, and/or otherwise forfeited his objection, that the court erred in using the interpleader mechanism to resolve the competing claims of defendants to the settlement funds.  (See *Norgart*, *supra*, 21 Cal.4th at p. 403; *Redevelopment Agency*, *supra*, 80 Cal.App.3d at p. 166.)

Reaching the merits, we conclude the interpleader procedure was properly invoked in the instant case, as we discuss next.

18

Interpleader Was the Proper Means to Resolve Defendants' Competing Claims to the

Settlement Funds

A. *Guiding Principles*

"Any person, firm, corporation, association or other entity against whom double or

multiple claims are made, or may be made, by two or more persons which are such that

they may give rise to double or multiple liability, may bring an action against the

claimants to compel them to interplead and litigate their several claims." (Code Civ.

Proc., § 386, subd. (b) (section 386).)

" '[I]nterpleader is an equitable proceeding in which the rights of the parties, as

between themselves, are governed by principles of equity.' [Citations.] 'The purpose of

interpleader is to prevent a multiplicity of suits and double vexation. [Citation.] "The

right to the remedy by interpleader is founded, however, not on the consideration that a

[person] may be subjected to double liability, but on the fact that he [or she] is threatened

with double vexation in respect to one liability." [Citation.]' (*City of Morgan Hill* [*v.

Brown* (1999) 71 Cal.App.4th 1114,] 1122 [(*Brown*)].) 'In an interpleader action, *the

court initially* determines the right of the plaintiff to interplead the funds; if that right is

sustained, an interlocutory decree is entered which requires the defendants to interplead

and litigate their claims to the funds.' [Citation.] Then, in the second phase of an

interpleader proceeding, the trial court also has 'the power under section 386 to adjudicate

19

the issues raised by the interpleader action including:  the alleged existence of conflicting claims regarding the interpleaded funds; plaintiffs' alleged position as a disinterested mere stakeholder; and ultimately the disposition of the interpleaded funds after deducting plaintiffs' attorney fees.'  [Citation.]"  (*Shopoff & Cavallo LLP v. Hyon* (2008) 167 Cal.App.4th 1489, 1513–1514.)

"In the past, interpleader was available only if four requirements were met.  These were (1) all claimants must have identical claims to the same thing, debt, or duty; (2) all adverse titles or claims must be dependent on or derived from a common source; (3) the person seeking the remedy must neither have an interest or claim in the subject matter; and (4) the person seeking the remedy must be an indifferent stakeholder and have no independent liability to any of the claimants.  [Citations.]

"Under current law, the scope of interpleader ' " 'has been broadened and enlarged.' " '  [Citations.]  Privity between the claimants is no longer required.  Further, interpleader may be permitted even though one claimant seeks part of the fund and the other claimant seeks the entire fund amount.  [Citations.]  Partial interpleader, where the obligor admits some liability but makes a partial claim or asserts a partial interest, is also allowed.  [Citation.]  Finally, it has been stated that the 'remaining restriction against independent liability is construed so that it is rarely an obstacle to the remedy.' [Citations.]

20

"Although section 386 has broadened the scope of the interpleader remedy, it is still required that the claimants seek the same thing, debt, or duty.  For example, in *Hancock Oil Co. v. Hopkins* [(1944)] 24 Cal.2d [497,] 508, a suit was brought by a lessee when rent and royalties were demanded by different claimants.  In *Conner v. Bank of Bakersfield* (1920) 183 Cal. 199, suit was brought by a bank against rival claimants to a bank deposit.  *Mutual Life Ins. Co. v. Henes* (1935) 8 Cal.App.2d 306, involved an insurer's suit against claimants to the proceeds of an insurance policy.  These cases all involved claims relating to the same thing, debt, or duty held by the stakeholder.  If the claims do not relate to the same thing, debt, or duty, then interpleader is improper.  (*Van Orden v. Anderson* (1932) 122 Cal.App. 132, 142.)  As the California Supreme Court explained, . . . 'the very rationale of interpleader compels the conclusion that [section 386] does not allow the remedy where each of the claimants asserts the right to a different debt, claim or duty.'  (*Hancock Oil Co. v. Hopkins*, *supra*, 24 Cal.2d at p. 504.)"  (*Brown*, *supra*, 71 Cal.App.4th at pp. 1122–1123; see also *Dial 800 v. Fesbinder* (2004) 118 Cal.App.4th 32, 43 [recognizing that an "interpleader proceeding is traditionally viewed as two lawsuits in one," where the "first dispute is between the stakeholder and the claimants to determine the right to interplead the funds," and the "second dispute to be resolved is who is to receive the interpleaded funds"].)

B. *Analysis*

We conclude Hood filed a legally sufficient complaint in interpleader. As shown by the record, Gonzales hired Hood specifically for the purpose of facilitating the distribution of the settlement funds. In that role, Hood came into possession of the unendorsed settlement check and a portion of the Cano settlement funds he had received from Jacobs. Hood filed the interpleader action only after he too was "fired" by Gonzales. At that time, there remained multiple conflicting claims pending against the settlement funds, including by three different attorneys of record, who, according to Jacobs, had collectively spent more than 1,000 hours working on the personal injury action, and, at least with respect to Silvers, PSB, and CA, who also had made loans and/or advanced costs to Gonzales that required repayment out of those funds. Under these circumstances, we conclude the settlement funds held by Hood were subject to "double or multiple claims" for purposes of section 386, subdivision (b), including by Gonzales himself, as demonstrated by this appeal.

Gonzales, for the first time on appeal, contends that Hood was not facing multiple claims on one liability under section 386 when he filed the interpleader action. Gonzales makes a series of arguments in support of this contention, including that the settlement check itself was more than sufficient to satisfy the "full amount of all sums allegedly owed to the lien holders in this action"; that Hood did not "control" the settlement check because it was unendorsed; that Hood offered no evidence to support his belief the

22

unendorsed check was in "eminent danger of expiring"; and that Hood did not allege any of defendants threatened to sue him for holding the settlement check. Gonzales also argues that Hood should have distributed the balance of the Cano funds to him, as opposed to interpleading them with the court; and that he was not afforded an adequate opportunity to challenge the interpleader procedure. We find these arguments unavailing.

Turning to his first point of error, there is no language in the interpleader statutes stating this procedure is available only in circumstances where multiple claims exceed the money or property deposited with a court. Nor has Gonzales pointed to any such language, or to any legal authority supporting such an argument. (See *Sprague v. Equifax, Inc.* (1985) 166 Cal.App.3d 1012, 1050 (*Sprague*) [stating the well-accepted principle that " 'every brief should contain a legal argument with citation of authorities on the points made," and that "[i]f none is furnished on a particular point, the court may treat it as waived, and pass it without consideration' [citation]].")

To the contrary, the plain language of section 386, subdivision (e) provides otherwise. The first sentence of this subdivision states: "Except in cases where by the law a right to a jury trial is now given, conflicting claims to funds or property or the value thereof so deposited or delivered shall be deemed issues triable by the court, and such issues may be first tried." (§ 386, subd. (e).)

The second sentence of this subdivision then addresses the *separate* issue when the amount of money or property deposited with the court is *less* than the amount claimed

23

to be due by one or more conflicting claimants.  It provides:  " In the event the amount deposited shall be *less* than the amount claimed to be due by one or more of the conflicting claimants thereto, or in the event the property or the value thereof delivered is *less* than all of the property or the value thereof claimed by one or more of such conflicting claimants, any issues of fact involved in determining whether there is a deficiency in such deposit or delivery shall be tried by the court or a jury as provided in Title 8 (commencing with Section 577) of Part 2 of this code."  (§ 386, subd. (e), italics added.)

In interpreting a statute, we consider its words as the " 'most reliable indicator of legislative intent.'  (*Tuolumne Jobs & Small Business Alliance v. Superior Court* (2014) 59 Cal.4th 1029, 1037.)  In doing so, we give the words 'their usual and ordinary meaning,' viewed in the context of the statute as a whole.  (*Pineda v. Williams-Sonoma Stores, Inc.* (2011) 51 Cal.4th 524, 529.)  As part of this process, ' " '[every] statute should be construed with reference to the whole system of law of which it is a part so that all may be harmonized and have effect.' " '  (*Elk Hills* [*Power, LLC. v. Board of Equalization* (2013) 57 Cal.4th 593,] 610.)"  (*Union of Medical Marijuana Patients, Inc. City of San Diego* (2019) 7 Cal.5th 1171, 1184; see *Green v. Workers' Comp. Appeals Bd.* (2005) 127 Cal.App.4th 1426, 1435 (*Green*) [noting that "[e]very word and clause is given effect so that no part or provision is useless, deprived of meaning, or contradictory" when interpreting a statute].)

24

Giving "every word" in subdivision (e) of section 386 its "effect" and meaning (*Green*, *supra*, 127 Cal.App.4th at p. 1435), it is clear from the unambiguous language in this subdivision that interpleader is not limited to situations where the claims to money or property exceed the amount deposited, as Gonzales argues. Rather, the plain language of subdivision (e) provides the *procedure* a court must follow depending on whether the "conflicting claims to funds or property" exceed the amount deposited. To read subdivision (e) of section 386 as Gonzales argues would render the first sentence of this subdivision mere surplusage. (*Green*, at p. 1435.) We thus reject the argument of Gonzales that interpleader is only available when the money or property deposited with the court is less than the competing claims to such.

Moreover, we note that interpleader applies whenever there are conflicting claims to money *or* property. (See § 386, subd. (b).) Thus, the fact that Hood was holding the settlement check, but could not deposit it into his client trust account because Gonzales would not endorse it, is not determinative under this statute. The record also shows Hood turned over the settlement check to the court clerk when he filed the interpleader action. We thus also reject Gonzales's argument that interpleader was improper because Hood did not "control" the settlement check, which argument, in any event, is unsupported by any legal authority. (See *Sprague*, *supra*, 166 Cal.App.3d at p. 1050.)

Generally relying on *Weaver v. Superior Court* (1979) 95 Cal.App.3d 166 (*Weaver*), Gonzales also argues interpleader was improper because there was no evidence

25

the settlement check was about to expire, and Hood's claims otherwise were insufficient to support such a finding. *Weaver*, however, involved a malicious prosecution action brought by a doctor against his former patient and her attorney based on a previous medical malpractice action. In opposing the attorney's motion for summary judgment, the plaintiff doctor declared the attorney filed the lawsuit on behalf of her client without investigating the facts of the case to create settlement leverage. The *Weaver* court found the doctor's statements to be nothing "more than speculation unsupported by any factual reference." (*Id.* at p. 187.) *Weaver* clearly is inapposite, as the issue in the instant case does not involve summary judgment but rather whether interpleader was proper.

In any event, we reject Gonzales's argument that Hood either should have held the settlement check until Gonzales found new counsel or let the uncashed check expire. Under the former scenario, there was no indication that Gonzales ever intended to endorse the check and allow it to be deposited into an attorney's client trust account, as he already had twice refused to do so: first, when represented by Jacobs; and second, when represented by Hood, who was retained by Gonzales specifically for the purpose of distributing the settlement funds.[10]

---

[10] Candidly, the situation likely would have been (much) different had Hood endorsed the settlement check and handed it over to Gonzales. In that instance, Gonzales (undoubtedly) would have endorsed the check and deposited the money in his own account, to the exclusion of the remaining claimants.

Under the latter scenario, there may have been legal consequences had Hood merely let the settlement check expire, which, as noted, involved a substantial sum of money. In any event, letting the settlement check expire would not have facilitated the resolution of this case; to the contrary, it likely would have led to more litigation and expense.

We also find unpersuasive Gonzales's argument that interpleader was improper because Hood did not allege in the complaint that any defendant threatened to sue him in connection with the settlement check. At the "core of the interpleader procedure is the notion that a 'claimant' is not a defendant from whom affirmative relief is sought. Interpleader actions impose *no* obligation on claimants. Claimants are simply *offered* the opportunity to assert a right to control of a stake." (*Cantu v. Resolution Trust Corp.* (1992) 4 Cal.App.4th 857, 875.) As a mere stakeholder, Hood was under no obligation to attempt to resolve any dispute between defendants as a condition to filing the interpleader action, or required to wait to file such an action until suit was threatened by one or more defendants against him. (See *id.* at p. 876 [noting a stakeholder's "obligation—like that of any interpleader party—was not to resolve the dispute between the claimants, but only to deposit money [or property] with the court which was to decide the dispute"].)

Gonzales also argues that Hood should have released the balance of the Cano funds (i.e., $32,744.50) to him, as Hood allegedly faced no risk of liability from the other

27

defendants.  We disagree.  The case of *Southern California Gas Co. v. Flannery* (2014) 232 Cal.App.4th 477 (*Flannery I*) informs our analysis on this issue.

In *Flannery I*, the plaintiff gas company (SCGC) filed an interpleader complaint against defendant Flannery and his former attorney Tepper, and deposited settlement funds with the clerk of the court.  Flannery and his former girlfriend Murray had sued the gas company in 2009 for damages from the 2008 Sesnon wildfire.  Tepper initially represented both Flannery and Murray.  In fall 2010, Murray retained separate counsel.  Tepper continued to represent Flannery until June 2012, when attorney Daneshrad substituted in as Flannery's counsel.  That same month, Tepper filed a notice of lien against any recovery in the case.  (*Flannery I*, *supra*, 232 Cal.App.4th at p. 482.)

In February 2013, Flannery, Murray and SCGC settled, which settlement was approved by the trial court.  The settlement required SCGC to pay before March 19, 2013, confidential sums to Flannery and his counsel, Murray and her counsel, and an attorney whose role was not relevant to the case.  The day after the settlement was finalized, Tepper sent an e-mail to all counsel stating he was " 'entitled to know the amount of the settlement[, asserted] a lien equal to 33 1/3% of the settlement proceeds' and requested 'assurances that [his] lien [would] be protected . . . .'  He further advised that if he was not given the requested assurances, he would 'apply to the court for an order requiring [his] lien to be protected and honored, and take such additional steps as may be necessary to enforce [his] lien.' "  (*Flannery I*, *supra*, 232 Cal.App.4th at p. 482.)

28

In response, counsel for SCGC advised attorneys Daneshrad and Tepper that absent written directions signed by both, it intended to interplead the settlement funds. Unable to reach agreement, SCGC filed the interpleader action, named Tepper, Daneshrad, Flannery, and ultimately Murray, to the action, and deposited the settlement funds with the court. (*Flannery I*, *supra*, 232 Cal.App.4th at pp. 482–483.) The trial court granted SCGC's discharge motion, finding the interpleader action legally sufficient. (*Id.* at pp. 484–486.)

In affirming the court's order, the *Flannery I* court rejected the argument of Flannery that SCGC, as part of its settlement, was contractually obliged to pay the settlement proceeds directly to him, and therefore, SCGC "did not face a plausible threat of double vexation." (*Flannery I*, *supra*, 232 Cal.App.4th at p. 486.) The court instead concluded that SCGC faced double vexation as a result of Flannery's and Tepper's competing claims to the settlement proceeds held by the gas company. (*Id.* at p. 487.)

In reaching its decision, the *Flannery I* court distinguished *Westamerica Bank v. City of Berkeley* (2011) 201 Cal.App.4th 598 (*Westamerica*) and *Brown*, *supra*, 71 Cal.App.4th 1114, cases on which Gonzales also relies. The *Flannery I* court found *Westamerica* distinguishable because there, the bank did not face double vexation by the city and a contractor, inasmuch as the bank was required to pay the city based on a "statutory escrow agreement governing funds relating to a public construction project" (*Flannery I*, *supra*, 232 Cal.App.4th at p. 488, citing *Westamerica*, at pp. 608–612); the

29

contractor under the terms of that agreement had no right to direct payment of the funds without the city's consent (*Flannery I*, at p. 448, citing *Westamerica*, at pp. 608–612); and the agreement obliged both the city and the contractor to "hold the bank harmless for following the city's instructions." (*Flannery I* at p. 488, citing *Westamerica*, at pp. 608–612.)

With respect to *Brown*, the *Flannery I* court also found it distinguishable because in that case, the city acknowledged it owed unpaid attorney fees but claimed it was a purported stakeholder because it faced conflicting claims from a law firm and one of the firm's former attorneys. The *Flannery I* court agreed with the decision in *Brown* that interpleader was not appropriate because the former attorney "only had a claim against the firm, not against the city" (*Flannery I*, *supra*, 232 Cal.App.4th at p. 488, citing *Brown*, *supra*, 71 Cal.App.4th at p. 1126), nor did the former attorney in *Brown* claim any " 'lien rights' in those fees." (*Flannery I*, at p. 488, quoting *Brown*, at p. 1126.)

Unlike the situation in *Westamerica* or *Brown*, the court in *Flannery I* found SCGC faced double vexation because "Tepper had notified the [gas company] of a lien on any recovery in the Sesnon Fire Case." (*Flannery I*, *supra*, 232 Cal.App.4th at p. 488.) The court explained SCGC's knowledge of the Tepper lien exposed it to double vexation: "That lien, considered in light of case law establishing liability for intentional interference with prospective economic advantage when a settling party pays a settlement to a party in derogation of a former attorney's lien on settlement proceeds, substantiates

30

SCGC's claim of double vexation.  (*Levin v. Gulf Ins. Group* (1999) 69 Cal.App.4th 1282, 1285 (*Levin*).)  A discharged attorney may state a cause of action for intentional interference with prospective economic advantage where a third party with notice of a lien for attorney fees pays the former client in settlement of the case without acknowledging the lien.  (*Ibid.*)  A litigant's former attorney is entitled to recover the reasonable value of services rendered to the time of discharge, but the right to such recovery does not ripen until the litigant prevails.  (*Fracasse v. Brent* (1972) 6 Cal.3d 784, 792 [(*Fracasse*]; *Levin*, at p. 1285.)  Where the attorney has a contingent fee contract with the creation of a lien in favor of the attorney upon recovery, the attorney becomes an equitable assignee of any judgment or settlement.  (*Levin*, at p. 1286.)  Payment of the judgment or settlement in disregard of the lien, where the payor has knowledge of the lien, exposes the payor to a claim for intentional interference with prospective economic advantage.  (*Id.* at p. 1287.)"  (*Flannery I*, at p. 488.)

Turning to the instant case, much like the gas company in *Flannery I*, Hood faced potential exposure for intentional interference with prospective economic advantage *if* he paid directly to Gonzales any portion of the Cano settlement funds from his client trust account, or turned over to Gonzales the check already endorsed by Jacobs, in disregard of the rights and/or liens of the lienholders, including as set forth in the March 30, 2017 "affirmation agreement" executed by Gonzales.  We thus reject Gonzales's argument that Hood should have paid any portion of the settlement funds directly to him, as Hood then

31

would have been potentially liable to the lienholders seeking payment from such proceeds. (See *Flannery I*, *supra*, 232 Cal.App.4th at p. 488; *Levin*, *supra*, 69 Cal.App.4th at p. 1287.)

Gonzales also argues he was not afforded an adequate opportunity to dispute the interpleader action, despite the fact he was served with the paperwork on August 18 and the hearing did not take place until September 14. The record, in any event, belies this argument.

Indeed, we note from his request for judicial notice[11] that on or about September 7, 2017, Gonzales attempted to file a declaration, which also included multiple attachments, that was similar to the one he ended up filing on September 20. However, the September 7 declaration was not received by the court before the September 14 hearing because Gonzales mistakenly filed it with the court presiding over the personal injury action. Not unlike the September 20 declaration, Gonzales in his September 7 declaration accused all of his previous attorneys of being "unethical" and taking advantage of him "throughout their legal representation." Also not unlike the September 20 declaration, the September 7 declaration did *not* directly oppose the interpleader action, but rather requested the court's "intervention to address the ongoing blatant abuse of attorney intellect/power" by his former legal counsel.

---

[11] Gonzales's unopposed request for judicial notice of the September 7, 2017 court filing and attachments is granted.

32

Moreover, the September 14 hearing, in which the court approved of the interpleader procedure, went unreported.  The record on appeal also does not include a settled statement or agreed statement as authorized by California Rules of Court, rules 8.134 and 8.137.  Thus, we do not know if Gonzales at that hearing requested a continuance or objected to the use of the interpleader procedure.

"[I]t is appellant's burden to provide a reporter's transcript if 'an appellant intends to raise any issue that requires consideration of the oral proceedings in the superior court . . . ' (Cal. Rules of Court, rule 8.120(b)), and it is the appellant who in the first instance may elect to proceed without a reporter's transcript  (Cal. Rules of Court, rule 8.130(a)(4)) . . . ."  (*Sanowicz v. Bacal* (2015) 234 Cal.App.4th 1027, 1034, fn. 5.)  Although in certain instances a reporter's transcript may not be necessary, including if an appeal involves a legal issue requiring de novo review (see, e.g., *Chodos v. Cole* (2012) 210 Cal.App.4th 692, 698–700 [finding transcript unnecessary for review of order granting an anti-SLAPP motion]), on issues such as the instant one involving the abuse of discretion standard of review, a reporter's transcript or an agreed or settled statement of the proceedings is indispensable.  (See § 386.6, subd. (a) [court has *discretion* to award stakeholder costs and attorney fees from the funds deposited with the court]; see e.g., *Ballard v. Uribe* (1986) 41 Cal.3d 564, 574 [declining to review the adequacy of an award of damages absent a transcript or settled statement of the damages portion of a jury trial]; *Vo. v. Las Virgenes Municipal Water Dist.* (2000) 79 Cal.App.4th 440, 447–448

33

(*Vo*) [concluding the "absence of a record concerning what actually occurred at the trial precludes a determination that the trial court abused its discretion"].)

As a result of the lack of a transcript of the September 14 hearing in which the court exercised its discretion and issued the elisor order (see *Vo*, *supra*, 79 Cal.App.4th at pp. 447–448), and given that Gonzales was able to file, albeit in the incorrect court, a September 7 declaration *before* that hearing, we find Gonzales was afforded an adequate opportunity to dispute the interpleader action.  (See *Southern California Gas Co. v. Flannery* (2016) 5 Cal.App.5th 476, 483–484 (*Flannery II*) [rejecting contention of appellants Flannery and Daneshrad they were denied due process in the interpleader action because both appellants filed their answers late, and because their answers were insufficient to place their claims to the interpleaded funds at issue before the court]; *Flannery I*, *supra*, 232 Cal.App.4th at p. 491 [rejecting Flannery's contention the court order granting SCGC's discharge violated due process because the " 'precise dictates of due process are flexible and vary according to context,' " quoting *Today's Fresh Start, Inc. v. Los Angeles County Office of Educ.* (2013) 57 Cal.4th 197, 212; and because Flannery in any event "had adequate ' "notice of the case against him and opportunity to meet it," ' " quoting *Mathews v. Eldridge* (1976) 424 U.S. 319, 348].)

In conclusion, when Hood filed the interpleader action he was between the proverbial rock and hard place:  at that time, there were six different parties with potentially conflicting claims to the settlement funds in his possession.  In order to avoid

34

a multiplicity of suits, the risk of inconsistent results if separately sued by each defendant, and the possibility that the unendorsed settlement check could expire if not deposited, Hood sensibly filed the interpleader action in order to allow the court to resolve defendants' claims and bring resolution to the case.  (See *Pacific Loan Mgmt. Corp. v. Superior Court* (1987) 196 Cal.App.3d 1485, 1489–1490 [recognizing that the "true test of suitability for interpleader is the stakeholder's disavowal of interest in the property sought to be interpleaded, coupled with the perceived ability of the court to resolve the entire controversy as to entitlement to that property without the need for the stakeholder to be a party to the suit"].)  For all the foregoing reasons, we conclude Hood properly invoked the interpleader procedure in this case.

III

Interpleader Discharge

Gonzales next argues the court erred in discharging Hood from, and awarding him costs and attorney fees in connection with, the interpleader action.  Gonzales argues that Hood's use of an ex parte procedure allegedly contravened the interpleader statutes; and reasserts that he lacked an adequate opportunity to challenge the award to Hood or the appointment of an elisor.  We find these arguments unavailing.

A. *Award of Costs and Fees Based on Ex Parte Motion*

1. Guiding Principles

Code of Civil Procedure section 386.5 (section 386.5) governs discharge of a stakeholder.  It provides:  "Where the only relief sought against one of the defendants is the payment of a stated amount of money alleged to be wrongfully withheld, such defendant may, upon affidavit that he [or she] is a mere stakeholder with no interest in the amount or any portion thereof and that conflicting demands have been made upon him [or her] for the amount by parties to the action, upon notice to such parties, apply to the court for an order discharging him [or her] from liability and dismissing him [or her] from the action on his [or her] depositing with the clerk of the court the amount in dispute and the court may, in its discretion, make such order."  (§ 386.5.)

Code of Civil Procedure section 386.6 (section 386.6) governs recovery of costs and fees by a stakeholder.  It provides:  "(a) A party to an action who follows the procedure set forth in Section 386 or 386.5 may insert in his [or her] motion, petition, complaint, or cross complaint a request for allowance of his [or her] costs and reasonable attorney fees incurred in such action.  In ordering the discharge of such party, the court may, in its discretion, award such party his [or her] costs and reasonable attorney fees from the amount in dispute which has been deposited with the court.  At the time of final judgment in the action the court may make such further provision for assumption of such costs and attorney fees by one or more of the adverse claimants as may appear proper. [¶]

36

(b) A party shall not be denied the attorney fees authorized by subdivision (a) for the reason that he [or she] is himself [or herself] an attorney, appeared in pro se, and performed his [or her] own legal services."  (§ 386.6.)

2.  Analysis

To obtain attorney fees under section 386.6, an interpleader plaintiff such as Hood must follow all the requirements of section 386 and 386.5, including disavowing any interest in the amount or property being interpleaded; depositing that amount with, or delivering said property to, the court; and seeking and obtaining a discharge from liability.  (See *Flannery I*, *supra*, 232 Cal.App.4th at pp. 489–490.)

Here, it is undisputed that Hood disavowed any interest in the settlement funds. There also is no dispute that Hood handed over the settlement check to, and deposited the balance of the Cano settlement funds from his client trust account with, the court clerk when he filed the interpleader action.  The record further shows Hood submitted the paperwork for appointment of an elisor and the determination of the propriety of his interpleader action on August 10, 2017, and served this paperwork on all parties, including Gonzales, by e-mail on August 18, with the hearing set for September 14.

Based on sections 385.6 and 386.6, and in light of the lack of a transcript of the September 14 hearing, we must "*conclusively presume*[] [the elisor order was] *correct* as to *all evidentiary matters*."  (See *In re Estate of Fain* (1999) 75 Cal.App.4th 973, 992 (*Fain*) [recognizing the effect of this rule is "that an appellant who attacks a judgment [or

order] but supplies no reporter's transcript will be precluded from raising an argument as to the sufficiency of the evidence"].)  We conclude under the facts of this case that the court properly exercised its discretion in discharging Hood from the action and awarding him costs and fees.  (See *Flannery I*, *supra*, 232 Cal.App.4th at p. 492 [recognizing section 386 gives a court the authority to discharge an interpleader plaintiff, and finding the award of attorney fees to SCGC was proper under section 386.6 because the " ' "experienced trial judge is the best judge of the value of professional services rendered in his [or her] court," ' " which judgment will not be disturbed unless it is " ' "clearly wrong" ' "].)

We also reject Gonzales's argument that Hood's use of an ex parte procedure contravened the interpleader statutes.  Section 386.5 merely provides that a stakeholder may "apply to the court" for an order seeking discharge of liability and dismissal from the action.  That Hood filed his papers ex parte with nearly 30-days' notice in no way contravenes section 386.5, particularly under the circumstances of this case.  Finally, as we discussed, we also reject Gonzales's argument he was not afforded an opportunity to dispute the award of costs and fees to Hood at the unreported September 14 hearing. (See *Vo*, *supra*, 79 Cal.App.4th at pp. 447–448.)

B.  *Appointment of Elisor*

Gonzales next argues the court erred at the September 14 hearing when it appointed an elisor under rule 2.5.11 to endorse the settlement check that Gonzales steadfastly refused to sign.  We disagree.

1.  Guiding Principles

Rule 2.5.11 provides:  "Where one of the parties will not or cannot execute a document necessary to carry out a court order, the clerk of the court, or his or her authorized representative or designee may be appointed as an elisor to sign the document. An application for appointment of an elisor may be made ex parte.  When applying for an appointment of an elisor, the application and proposed order must designate 'The Clerk of the Court or Clerk's Designee' as the elisor and indicate for whom the elisor is being appointed and in what capacity they are to sign the document.  The application must not set forth a specific court employee.  The order must expressly identify the document being signed and a copy of the document must be attached to the proposed order.  The original document, presented for signature by the elisor, must match the copy of the document attached to the proposed order.  The declaration supporting the application must include specific facts establishing the necessity for the appointment of the elisor.  If the elisor is signing documents requiring notarization, the applicant must arrange for a notary public to be present when the elisor signs the document(s)."

2. <u>Analysis</u>

The record unambiguously establishes that Gonzales refused to endorse the settlement check on at least two occasions, as we have noted. The record further shows Gonzales retained Hood specifically for the purpose of facilitating the distribution of the settlement funds among the various defendants. Hood agreed to undertake that representation based on Gonzales's promise to endorse the check; otherwise, there was no way Hood could distribute the settlement funds to the various claimants, as he was hired to do.

We conclude under these circumstances that the court, sitting in equity, acted well within its discretion in appointing the court clerk as elisor to endorse the settlement check. (See *Chow*, *supra*, 230 Cal.App.4th at p. 1020 [noting an appellate court reviews an order appointing the clerk of the court as elisor for abuse of discretion, and affirming an order appointing elisor to execute escrow agreement "on behalf of a recalcitrant party . . . where the party refuses to execute such documents"]; see also *Arnolds Management Corp. v. Eischen* (1984) 158 Cal.App.3d 575, 579 [recognizing the "equitable maxim that a court of equity will not order that a useless act be performed"].)

Moreover, because the September 14 hearing was unreported, we must assume Gonzales at that hearing did not present any valid evidentiary basis for denying appointment of an elisor. (See *Fain*, *supra*, 75 Cal.App.4th at p. 992 ["it is presumed that the unreported trial testimony would demonstrate the absence of error"].)

40

IV

The Distribution Order Was Proper

Finally, Gonzales argues the court erred in adjudicating the issues raised by interpleader as set forth in its November 30 distribution order. Gonzales argues the interpleader action should have been stayed to allow him to pursue arbitration with Silvers, PSB, and Jacobs pursuant to section 6201 of the Business and Professions Code. However, as we have repeatedly noted, Gonzales forfeited on appeal this claim of error with respect to Silvers and PSB because he agreed during the October 27 hearing that they were owed the amounts set forth in the lienholders' proposed stipulation. (See *Norgart*, *supra*, 21 Cal.4th at p. 403; *Redevelopment Agency*, *supra*, 80 Cal.App.3d at p. 166.)

Moreover, Gonzales also forfeited this claim of error with respect to all of his prior attorneys—including Jacobs—because he agreed in his answer to the interpleader complaint that it was the court's "job" to determine the validity of the lien claims and in what amounts. (See Bus. & Prof. Code, § 6201, subd. (d) [providing that a "client's right to request or maintain arbitration under the provisions of this article is *waived* by the client commencing an action or filing any pleading seeking either of the following: [¶] (1) Judicial resolution of a fee dispute to which this article applies"] (italics added).) As such, we find this argument unavailing.

41

Gonzales also challenges on appeal the costs and fees awarded to stakeholder Hood, which challenge he also raised at the October 27 hearing. However, an objection to a fee award on the ground the interpleader action itself was improper must be made during the "first phase" of the proceeding, or such a challenge or objection is forfeited. (See *Farmers New World Life Ins. Co. v. Rees* (2013) 219 Cal.App.4th 307, 317.) As we have repeatedly noted, there is no record of any such challenge by Gonzales at the September 14 hearing. (See *Vo*, *supra*, 79 Cal.App.4th at pp. 447–448.)

Putting aside the funds collectively paid to Nexus and Everence, which totaled less than $1,000, it appears the key issue with respect to the distribution order was the money awarded to Jacobs. Gonzales in his September 20 declaration claims he "called out" Jacobs and that Jacobs in response allegedly agreed to reduce his attorney fees in writing to "12-25% of the PCI—$299,999.99 via [the] May 22, 2017, 'Addendum to Retainer Agreement.' " Although the original retainer agreement between Jacobs and Gonzales is not included in the appellate record, the May 22 addendum referenced by Gonzales is.

Among other terms, the May 22 addendum provided that "[r]easonable Attorney Fee's will be negotiated between Client and Attorney." The addendum therefore does not support Gonzales's claim that Jacobs agreed to reduce his fee award to 12 to 25 percent of the amount of the settlement check.

Moreover, in his September 6, 2017 answer to the interpleader complaint, Jacobs stated he "represented defendant Gonzales pursuant to a written Retainer Agreement,

42

which specified: 'Attorneys' fees shall be forty percent (40%) of any gross recovery, whether by settlement, arbitration or trial. "Gross recovery" means the total amount received <u>before</u> it has been reduced by the sum of all "costs" as defined below.' " As noted *ante*, the proposed stipulation of the lienholders had Jacobs receiving $160,000 of the total settlement funds (i.e., 40 percent of $399,999.99—the amount of the settlement check ($299,999.99) plus $100,000).

As also noted *ante*, Jacobs at the October 27 hearing represented he had spent about 340 hours in the personal injury action; that he prepared a bill showing the work he had done preparing the case for trial; and that, at a minimum, he was entitled to $300 per hour under the fee agreement for work billed, or $102,090. Jacobs, however argued a fee of about $120,000 (i.e., 40 percent of $299,999.99) was "eminently fair," in recognition he substituted into the case after the $100,000 Cano settlement.

Typically, after discharge an attorney's recovery is limited to the reasonable value of services actually performed (i.e., quantum meruit) by the attorney, and not the full percentage specified in the contract. (See *Flannery II*, *supra*, 5 Cal.App.5th at p. 494, citing *Fracasse*, *supra*, 6 Cal.3d at p. 792.) However, to the extent "such discharge occurs 'on the courthouse steps,' where the client executes a settlement obtained after much work by the attorney, the factors involved in a determination of reasonableness would certainly justify a finding that the entire fee was the reasonable value of the attorney's services." (*Fracasse*, at p. 791; compare *Hensel v. Cohen* (1984) 155

43

Cal.App.3d 563, 564 [noting when an attorney accepted a personal injury case on a contingent fee basis, performed some investigation and filed a complaint, but then determined that it was not worth the time to pursue that matter and suggested the client look elsewhere for legal assistance, that attorney could not claim a part of any subsequent recovery by way of settlement or judgment, obtained by the efforts of another attorney].)

We conclude the court did not err in making an award to Jacobs at the October 27 hearing, as Jacobs perfected his right to claim such fees when he filed his September 6 answer to the interpleader action. (See *Flannery II*, *supra*, 5 Cal.App.5th at p. 494 [finding an attorney's answer to an interpleader complaint satisfied the "independent action" requirement for perfecting lien rights].)

We further conclude the court properly exercised its discretion when it took a middle-of-the-road approach in making the fee award to Jacobs, reducing his proposed fee by $40,000 and increasing Gonzales's award by the same amount; and in paying Jacobs $17,903 more (i.e., $119,993–$102,090) than his "quantum meruit recovery." Indeed, when fired by Gonzales, Jacobs already had satisfied the contingency by obtaining a settlement with the lone remaining defendant in the personal injury action, after expending about 340 hours of attorney time. (See *Fracasse*, *supra*, 6 Cal.3d at p. 792.) Because the " ' "experienced trial judge is the best judge of the value of professional services rendered in his [or her] court" ' " (see *Flannery I*, *supra*, 232

44

Cal.App.4th at p. 492), we affirm the distribution to Jacobs, as it was not " ' "clearly wrong." ' " (*Ibid.*)[12]

DISPOSITION

The elisor and distribution orders are affirmed.  In the interests of justice, the parties are to bear their respective costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(5).)

BENKE, J.

WE CONCUR:

McCONNELL, P. J.

HUFFMAN, J.

---

[12] Although Gonzales represented at the October 27 hearing that neither Nexus nor Everence were entitled to any payment—even a de minimis one—out of the settlement funds, and that he had spoken to a representative of Everence who indicated the company allegedly did not expect to be paid, there is no record evidence to substantiate his claims. We note such unsubstantiated representations also conflicted with the allegations in the interpleader complaint; were contrary to the lienholders' proposed stipulation, which included the signatures of representatives of both entities; and were inconsistent with Gonzales's November 2 objection lodged with the court, in which he argued neither entity should receive anything because they had not appeared at the October 27 hearing.